## STATE OF CONNECTICUT *v.* VIRGIL WILSON-BEY, SR. (7413)

BORDEN, SPALLONE and LAVERY, Js.

Argued December 14, 1989—decision released April 3, 1990

*Mark S. Baldwin,* special public defender, with whom, on the brief, were *William H. Narwold,* and *David D. Legere,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Kevin M. Kennedy,* law student intern, for the appellee (state).

SPALLONE, J. A jury convicted the defendant of the crimes of violation of the state dependency producing drug law; General Statutes § 21a-277 (a); and possession of drug paraphernalia in a drug factory situation. General Statutes § 21-277 (c). On appeal, the defendant claims that the trial court erred (1) in allowing into evidence items seized from the defendant's apartment in violation of his rights under the fourth and fourteenth amendments to the federal constitution and under article first, § 7, of the state constitution, (2) in admitting out-of-state laboratory reports without requiring the state to present testimony to indicate whether they were business records under General Statutes § 52-180, (3) in admitting the results of tests performed by an out-of-state laboratory in violation of his right to confront witnesses against him under the sixth and fourteenth amendments to the federal constitution and under article first, § 8, of the state constitution, (4) in failing to require the state to prove beyond a reasonable doubt that he was guilty of possession with intent to distribute cocaine in violation of § 21a-277 (a), (5) in

failing to comply with General Statutes § 54-84 (b)[1] concerning his failure to testify, and (6) in refusing to give the jury a cautionary instruction concerning the prosecutor's inflammatory remarks.

The evidence adduced at trial reasonably supports the facts as follows. Carolyn Hamrick and the defendant lived in an apartment in the city of Bridgeport with their son, Virgil Jr., and Hamrick's daughter. The apartment consisted of a living room, kitchen, bathroom and two bedrooms. On June 2, at about 6 a.m., the defendant and Frank Braswell, a neighbor, arrived at the apartment and smoked crack with a glass pipe and a propane torch. Braswell took the torch with him when he left. The defendant went to bed after informing Hamrick that she should expect John Lee to arrive at the apartment, and that she should give Lee $100 in return for vials of crack. Lee arrived at about 8 a.m. and the exchange transpired.

Hamrick then went to Braswell's apartment to get the propane torch and returned to her own apartment with Jennifer Braswell, where the two of them smoked crack. Just after 10 a.m., Hamrick left Virgil, Jr., watching television in the living room while she went to a convenience store across the street to buy milk. She left the lit propane torch on the washing machine in the kitchen. The apartment caught fire while she was out. The Bridgeport fire department arrived shortly thereafter and gained control of the blaze within twenty minutes. Firefighters rescued the defendant and Virgil, Jr., from the apartment, but Virgil, Jr., died after reaching the hospital.

---

[1] General Statutes § 54-84 (b) provides: "Unless the accused requests otherwise, the courts shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. In cases tried to the court, no unfavorable inferences shall be drawn by the court from the accused's silence." Note that in this case the defendant did in fact "request otherwise."

Assistant Chief Encole Spinelli of the Bridgeport fire department was the officer in charge of the detail fighting the fire. Once the fire was extinguished, Spinelli examined the apartment. He found that the living room was thoroughly gutted. There was heat and flame damage in portions of the kitchen, and there was severe smoke damage throughout the apartment. Because the living room had apparently ignited very quickly, Spinelli suspected the presence of an accelerant and he called the arson squad. An arson investigator arrived minutes later.

The arson investigator, Spinelli and other firefighters conducted an "overhaul" of the apartment. The overhaul process, as explained by Spinelli, constitutes a search of the entire premises for smoldering cinders or other hazards. The purpose is to leave the premises in as safe a condition as possible. Firefighters also investigate the cause of the fire while conducting an overhaul.

The overhaul of the defendant's apartment revealed evidence of illegal drug activity. There were empty crack vials in a film container located on a dresser top in a rear bedroom. The metal surfaces of the kitchen refrigerator were warped by heat, prompting an inspection of the appliance, and inside the investigators found a plastic bag of white powder later determined to be cocaine. From the living room floor, the investigators seized a wallet containing $187 and the crack vials that had been delivered to the defendant by Lee.

There was further evidence that the defendant was involved in the use and sale of illegal drugs. The day before the fire, the defendant telephoned Hamrick and told her that he was selling cocaine at Jackson's poolroom. Also, about one week earlier, Hamrick's daughter had seen the defendant selling crack, and Hamrick's sister had seen the defendant smoking crack while she was visiting the apartment two weeks before.

The defendant first claims that the trial court erred by admitting into evidence items that were unlawfully seized from his apartment. The defendant maintains that the warrantless search of his apartment after the fire was excessive in scope and should have been restricted to the living room area of the apartment because the fire was confined to that area, because the cause of the fire was apparent, and because there was no need to search the remainder of the apartment to determine the cause of the blaze. We disagree.

It is well established that a burning building is an exigent circumstance that justifies warrantless entry by firefighters. *Michigan* v. *Clifford,* 464 U.S. 287, 299–300, 104 S. Ct. 641, 78 L. Ed. 2d 477 (1984); *Michigan* v. *Tyler,* 436 U.S. 499, 509–10, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978). Fire officials may remain at the scene without a warrant until all of their duties are completed. Among their duties, aside from dousing the blaze, are to conduct an overhaul; *Steigler* v. *Anderson,* 496 F.2d 793, 795 (3d Cir. 1974); *United States* v. *Johnson,* 524 F. Sup. 199, 204 (D. Del. 1981), rev'd in part, 690 F. 2d 60 (3d Cir. 1982), cert. denied, 459 U.S. 1214, 103 S. Ct. 1212, 75 L. Ed. 2d 450 (1983); and to investigate the cause of the fire. *Michigan* v. *Tyler,* supra.

The warrantless fire investigation that occurred in this case is closely analogous to that approved in *United States* v. *Johnson,* supra. In that case, there was a fire in the second floor front bedroom of a house. After overhaul procedures revealed controlled substances in the rear bedroom of the second floor, a federal drug enforcement officer was summoned. He finally arrived two and one-half hours after the fire had been extinguished. The fire investigator suspected that either arson or faulty wiring was the cause of the fire. While inspecting the wiring in the basement, the fire inves-

tigator noticed certain equipment, which the drug enforcement officer later identified as drug manufacturing equipment.

The defendant relies on the United States Supreme Court case of *Michigan* v. *Clifford,* supra, in which a fire investigation was held to be an unreasonable search. That case is distinguishable because there the investigation of the cause of the fire occurred when investigators returned to the scene six and one-half hours after the fire was suppressed. The fact that insurance agents had begun to board up the premises was a clear indication that the exigent circumstances had passed. In the present case, the overhaul was conducted immediately after the fire was extinguished while firefighters were still on the scene performing their duties.

We reject the defendant's argument that because the fire investigators in this case found the propane torch and the majority of fire damage in the living room they should not have entered the remainder of the apartment. Fire officials must search for possible victims, ventilate the entire premises, and check for smoldering embers or other hazards. *Steigler* v. *Anderson,* supra; *United States* v. *Johnson,* supra.

In the present case, all items were seized during the overhaul procedure, and all of the items were in plain view of the investigators. The bag of white powder in the refrigerator was not initially in plain view, but the investigators had a legitimate reason to inspect that appliance because it had sustained intense heat damage during the fire. Once the investigators were legitimately inspecting the refrigerator, the evidence they found therein was in plain view. See *Harris* v. *United States,* 390 U.S. 234, 236, 88 S. Ct. 992, 19 L. Ed. 2d 1067 (1968).

In his second and third claims of error, the defendant asserts that the trial court illegally admitted into

evidence as business records certain test results from an out-of-state laboratory. Neither claim is persuasive.

When the defendant was treated for smoke inhalation and burns at Bridgeport Hospital, blood and urine tests were performed. The attending physician testified at trial that it is routine to check the bodily fluids of smoke inhalation victims for carbon monoxide deposits. He also stated that when a patient is agitated or semiconscious, the normal medical procedure is to perform a toxic screen of the bodily fluids in order to discover whether traces of drugs or alcohol are present, and thereby determine the medical reason for the patient's agitation or semiconsciousness. In the present case, the defendant appeared agitated, and the toxic screen of his bodily fluids revealed the presence of cocaine and coke metabolites. The results of the toxic screen were incorporated in the defendant's medical chart at the Bridgeport Hospital, and this chart was later admitted into evidence at trial.

Because the defendant's medical chart met the requirements of General Statutes § 52-180,[2] it was admissible as evidence despite the fact that it contained hearsay statements. In the present case, the toxic screen was performed by a Pennsylvania laboratory, which later transmitted the results to the Bridgeport Hospital. There is no requirement that records be prepared by the organization itself to be admissible as the organization's business records. *Crest Plumbing & Heating Co.* v. *DiLoreto,* 12 Conn. App. 468, 475,

---

[2] General Statutes § 52-180 (a) provides: "Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of the act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of the business to make the writing or record at the time of the act, transaction, occurrence or event or within a reasonable time thereafter."

531 A.2d 177 (1987); see *State* v. *Damon,* 214 Conn. 146, 156–57, 570 A.2d 700 (1990). Where an entry in a hospital record is pertinent to the care or treatment of a patient, it is admissible. *D'Amato* v. *Johnston,* 140 Conn. 54, 61, 97 A.2d 893 (1953).

Nor did the admission of this hearsay evidence violate the defendant's right to confrontation of adverse witnesses. Though the defendant was not afforded an opportunity to cross-examine the chemists at the Pennsylvania toxicology laboratory, his right to confrontation was not violated because there were indicia of reliability that minimized the possibility of harm in placing the evidence before the jury in that the results of the toxic screen of his bodily fluids were the product of a standard testing procedure. *Reardon* v. *Manson,* 806 F.2d 39, 43 (2d Cir. 1986).

The trial court properly admitted the test results as hospital business records notwithstanding the fact that the tests were conducted in an out-of-state laboratory.

Although the defendant in his fourth claim of error argues that the evidence was insufficient to prove him guilty of possession with the intent to sell cocaine, our review of the record and transcripts indicate ample evidence to support the jury's verdict. See *State* v. *Ruth,* 16 Conn. App. 148, 153–55, 547 A.2d 548 (1988), cert. denied, 209 Conn. 827, 552 A.2d 434 (1989); *State* v. *Williams,* 16 Conn. App. 75, 78, 546 A.2d 943 (1988); *State* v. *Marsala,* 15 Conn. App. 519, 527, 545 A.2d 1151, cert. denied, 209 Conn. 816, 550 A.2d 1087 (1988). The defendant's fourth claim of error lacks merit.

Next, the defendant claims that, because the trial court did not charge the jury in the exact language of General Statutes § 54-84 (b), it is automatically reversible error. The defendant submitted to the court a request to charge the jury. As part of that request, the defendant asked for the following charge: "I admon-

ish you to draw no inferences whatsoever from this event [defendant's failure to testify]." The trial court charged as requested. We have held that failure to charge in the exact language of the statute is error, but such judicial nonconformance does not automatically warrant a reversal and a new trial. *State* v. *Townsend,* 206 Conn. 621, 625, 539 A.2d 114 (1988). The court's charge, although erroneous, was given as requested by the defendant. An erroneous charge, induced by the defendant's request, does not entitle him to a new trial. *State* v. *Cobbs,* 164 Conn. 402, 424, 324 A.2d 234, cert. denied, 414 U.S. 861, 94 S. Ct. 77, 38 L. Ed. 2d 112 (1973).

In his last claim, the defendant contends that the trial court erroneously denied his motion for a mistrial. In this motion, the defendant claimed that certain of the prosecutor's comments during final argument were improper and rendered the trial as a whole unfair. *State* v. *Evans,* 10 Conn. App. 605, 609, 524 A.2d 1165 (1987). The prosecutor stated that the defendant and Hamrick, "were peddling this crack, this death." The prosecutor also stated: "There was death all over the apartment," and "the state would call it peddling death." The defendant's motion was also based on the fact that the court did not give an immediate curative charge to the jury. *State* v. *Benton,* 161 Conn. 404, 413, 288 A.2d 411 (1971).

Although the trial court did not give an immediate curative instruction, it did caution the jurors in its charge that their determination must not be based upon emotion, that they were limited to the evidence and no other source, that it was their recollection of the evidence that was controlling and not what counsel had argued to them, that the jury had to find the case proven by the evidence and they could not go outside the evidence, and that the evidence had to establish the existence of every element beyond a reasonable doubt.

Jurors are presumed to follow the instruction given by the judge. *State* v. *Smith,* 212 Conn. 593, 599, 563 A.2d 671 (1989).

Moreover, the defendant has failed to show prejudice. "When the verdict in a criminal case is challenged on the basis of allegedly prejudicial remarks made by the prosecutor, the defendant bears the burden of proving such prejudice within the context of the trial as a whole. 'The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct.' " *State* v. *Evans,* supra, 608, quoting *State* v. *Binet,* 192 Conn. 618, 628, 473 A.2d 1200 (1984).

Our review of the remarks in light of the entire charge, the evidence and the verdicts indicates that the defendant has failed to show that he was prejudiced by the prosecutor's remarks. All but one of the comments of the prosecutor referred to the manslaughter count of which the defendant was acquitted. As to the drug counts on which the defendant was convicted, the record indicates that the evidence as to these counts was more than ample to sustain the verdict of guilty. Under the facts and circumstances of this case, we cannot say that the defendant has shown that his trial was unfair and in violation of due process.

There is no error.

In this opinion the other judges concurred.